# EXHIBIT A

| | |
|---|---|
| **DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO**<br>1437 Bannock Street, Room 256<br>Denver, CO 80202<br>Telephone: (720) 865-8301<br>_____<br><br>**Plaintiff:**   **RDP BARRICADE COMPANY LLC**<br><br>**v.**<br><br>**Defendant:**   **ZURICH AMERICAN INSURANCE COMPANY**<br><br>_____<br>***Attorneys for Plaintiff:***<br>Bradley A. Levin, Reg. No. 13095<br>Nelson A. Waneka, Reg. No. 42931<br>**LEVIN SITCOFF PC**<br>1512 Larimer Street, Suite 650<br>Denver, CO  80202<br>Phone: (303) 575-9390<br>Fax: (303) 575-9385<br>bal@levinsitcoff.com<br>naw@levinsitcoff.com | DATE FILED: March 18, 2018 1:32 PM<br>FILING ID: 327EEF216EDDC<br>CASE NUMBER: 2018CV30965<br><br><br>▲ **COURT USE ONLY** ▲<br><br>_____<br><br>**Case Number:**<br><br>**Division:** |

## COMPLAINT AND JURY DEMAND

Plaintiff, RDP Barricade Company LLC, by and through its attorneys, LEVIN SITCOFF PC, for its Complaint and Jury Demand against Defendant, Zurich American Insurance Company, states and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff, RDP Barricade Company LLC, is a Colorado limited liability company doing business in the State of Colorado.

2.      Upon information and belief, Defendant, Zurich American Insurance Company, is a New York corporation with its principal place of business in New York.  Zurich is authorized to do business, and at all relevant times was doing business, in the State of Colorado.

3.     This Court has jurisdiction over the subject matter of this action because the Defendant conducts business in Colorado, and because many of the events giving rise to the claims asserted herein occurred in Colorado.

4.     Pursuant to C.R.C.P. 98(c), venue is proper in Denver County, which Plaintiff designates as the place of trial of this action.

## <u>GENERAL ALLEGATIONS</u>

5.     RDP Barricade Company was formed in 2013 when Zachary Frisch ("Frisch") learned of an opportunity to purchase the Colorado branch of Highway Technologies, Inc., out of bankruptcy (the "Colorado Branch").

6.     Highway Technologies was a Houston-based construction company providing highway barriers, traffic control devices, and barriers for detours and emergency road closures.

7.     After learning of the bankruptcy, Frisch informed his business partners at the time, Jordan Scharg ("Scharg") and Richard Naha ("Naha"), of the opportunity to bid on the Colorado Branch at the bankruptcy auction.  Frisch, Scharg, and Naha collectively did business together under the name Raindrop Partners.

8.     Frisch contacted Ted Ott ("Ott") to inquire whether he too was interested in forming a group to bid on the Colorado Branch at the bankruptcy auction.

9.     Ott was the former Rocky Mountain and Solar Regional Manager of Highway Technologies.

10.     As part of the deal, Ott agreed to work with Frisch and Scharg to purchase the assets of Highway Technologies out of bankruptcy.

11.     Ott prepared 24-month financial projections and EBITDA forecasts, a cash flow projection, asset valuations, and an employee projection that Frisch and Scharg relied upon to secure financing for the purchase.

12.     Ott further assumed many of the responsibilities for relaunching the business and managing its day-to-day operations.  These included recruiting and hiring back prior Highway Technologies employees, assuming property leases, acquiring equipment leases, and reestablishing customer relationships and contracts.

13.     Ott also contributed $30,000 of his own money and agreed to a $67,000 pay cut in exchange for a 3.0% Class A equity interest in RDP Barricade Company.

14.     Frisch and Scharg likewise agreed to help run RDP Barricade Company and to perform duties for the company in exchange for management fees of $50,000 each.

2

15.     Prior to securing Ott's involvement and capital contribution, however, Frisch failed to disclose to Ott that he had granted Naha a 26.16% Class B equity interest without Naha making any capital contribution to RDP Barricade Company nor agreeing to perform any services.

16.     Additionally, Frisch failed to disclose to Ott that the initial capital contributions of Frisch and Scharg would be converted to loans and repaid by the company.

17.     As a result, Frisch and Scharg each received 26.17% Class B equity interests in RDP Barricade Company based on capital contributions that were in fact loans to be repaid, and Naha received an identical 26.17% Class B equity interest without making any contributions to the company whatsoever.

18.     In 2013, Scharg attended the bankruptcy auction, and the group was the successful bidder.  Following the closing of the transaction, and the execution of the company's Amended and Restated Operating Agreement, Ott learned of Naha's ownership and the treatment of Frisch and Scharg's capital contributions as loans.

19.     All of these interests greatly diminished the value of Ott's equity and should have been disclosed to him.

20.     As a result, Ott retained the law firm of Sherman & Howard to represent him in connection with his partnership and investment in RDP Colorado Barricade.

21.     On August 12, 2014, Sherman & Howard sent a letter to Frisch and Scharg outlining Ott's allegations regarding misrepresentations and concealments made to him concerning RDP Barricade Company's equity structure.

22.     The letter requested reorganization of the company to grant Ott a substantially similar equity interest to those held by Frisch, Scharg, and Naha.

23.     The August 12, 2014 letter did not demand that Frisch, Scharg, or Naha forfeit their existing equity.

24.     The August 12, 2014 letter did not demand that Frisch forfeit his $50,000 management fee.

25.     The August 12, 2014 letter did not demand that Frisch be "squeezed out" of the company.

26.     In January 2015, RDP Barricade Company, Ott, Frisch, Scharg, and Naha agreed in principle to resolve the dispute outlined in the August 12, 2014 letter.

27.     Among other things, the parties proposed to enter into a settlement agreement providing for the entry of a Second Amended and Restated Operating Agreement governing RDP Barricade Company.

28.     This Second Amended and Restated Operating Agreement would reduce the equity interests of Frisch, Scharg, and Naha to accommodate for an increased Class B equity interest to Ott.

29.     Also as part of the settlement, Ott agreed to enter into a four-year employment contract with RDP Barricade Company that included certain restrictive covenants.

30.     Frisch refused to sign the settlement agreement with Ott or the Second Amended and Restated Operating Agreement.

31.     During and following negotiations regarding the settlement agreement with Ott, a new dispute arose between Frisch and RDP Barricade Company's other equity investors because of the way Frisch perceived he was being treated with respect to other, separate business deals that had nothing to do with RDP Barricade Company.

32.     Namely, Frisch felt that he had been treated unfairly regarding separate transactions known as Greenhouse LLC and Greenhouse II LLC (collectively, the "Greenhouse Deals").

33.     As a result of the separate dispute involving the Greenhouse Deals, Frisch's relationship with Scharg and certain of RDP Barricade Company's other investors deteriorated.

34.     For reasons unrelated to the settlement of Ott's request for reorganization, Frisch stopped performing any services for RDP Barricade Company despite continuing to draw his $50,000 management fee and continuing to be insured under the company's insurance plan.

35.     For reasons unrelated to the settlement, Frisch stopped showing up to perform any work at RDP Barricade Company.

36.     For reasons unrelated to the settlement, Frisch continued to hold himself out as an operative of RDP Barricade Company despite the fact that he was no longer performing any services for the company.  This included using the company's email for other business deals.

37.     For reasons unrelated to the settlement, Frisch used RDP Barricade Company's business premises for pursuits unrelated to the company, including the pursuit of other business deals and transactions, without paying any rent or providing any other compensation to RDP Barricade Company.

38.     Because Frisch's relationship with RDP Barricade Company's other equity investors had deteriorated due to the separate issues involving the Greenhouse Deals, and because Frisch was refusing to sign the settlement agreement to resolve Ott's allegations of fraud, Frisch suggested that he be bought out RDP Barricade Company entirely.

39.     Despite several rounds of negotiations, the parties were unable to reach an agreement on the value of Frisch's equity interest such that the buy-out was never effectuated.

40.     Left with no alternative, RDP Barricade Company relied on the terms of its then-effective Amended and Restated Operating Agreement, which granted the company's manager authority to call back shares upon the super-majority approval of Class A shareholders.

41.     Upon securing the approval of this super-majority, the manager: (1) entered RDP Barricade Company into the settlement and called back 4.6666 Class B shares from Frisch, Scharg, and Naha; (2) granted additional Class B shares to Ott; and (3) entered into the Second Amended and Restated Operating Agreement.

42.     Furthermore, to the extent Frisch was receiving a $50,000 fee for certain unnamed and unperformed duties, his engagement by the company and insurance were terminated by the manager.

43.     On March 3, 2016, Frisch filed a lawsuit in Colorado state court against RDP Barricade Company, Ott, Scharg, and others alleging they had wrongfully deprived him of his 4.6666 Class B shares, his $50,000 management fee, and his health insurance (the "Frisch Lawsuit").  In his initial Complaint, Frisch asserted claims for breach of contract, promissory estoppel, unjust enrichment, quantum meruit, rescission, intentional interference with contractual relations, and civil conspiracy.

44.     On October 13, 2016, Frisch filed an Amended Complaint in the Frisch Lawsuit that completely re-worked his entire lawsuit.  Instead of claiming that his management fee and insurance had been supposedly guaranteed for four years and wrongfully terminated, Frisch alleged for the first time that the reorganization (through its modification of the capitalization table to reflect that Scharg, Naha, and Frisch each owned 4.6666 fewer Class B shares and that Ott received additional Class C shares) amounted to the "civil theft" of Frisch's shares, and that the reorganization was improper because Frisch had supposedly been misled into signing the Amended and Restated Operating Agreement which gave the manager authority to take such action upon the approval of the super-majority of Class A shares.

45.     Frisch's First Amended Complaint also contained allegations of impropriety concerning the Greenhouse Deals, as well as another deal known as Circle Fresh Farms, in addition to claims and allegations against Scharg personally, which sought a portion of the consulting fees that Scharg had earned on entirely unrelated projects.

46.     Frisch's First Amended Complaint contained 17 causes of action, including a claim for breach of fiduciary duty against Denver Barricade Company ("DBC"), a company formed by the investors that held a super-majority of the Class A shares in RDP Barricade Company. Moreover, Ott was removed as a Defendant from Frisch's First Amended Complaint.

47.     Frisch has since filed a Second Amended Complaint, though most of the allegations remain the same.

5

48.     Long before Frisch filed the Frisch Lawsuit or any of its amendments, RDP Barricade Company and certain of its investors and employees were insured under a commercial insurance policy issued by Defendant Zurich American Insurance Company (the "Policy.")

49.     The Policy included $1,000,000 in aggregate limits for Management and Company Liability.

50.     Among other things, the Management and Company Liability Coverage Part states:

> The Underwriter shall pay on behalf of the **Insured Persons** all **Loss** for which the **Insured Persons** are not indemnified by the **Company** and which the **Insured Persons** become legally obligated to pay on account of any **Claim** first made against them, individually or otherwise, during the **Policy Period** or the **Extended Reporting Period** or **Run-Off Coverage Period**, if exercised, for a **Wrongful Act** taking place before or during the **Policy Period**, subject to the applicable Limits of Liability set forth in Items 2 and 6 of the Declarations.
>
> \*      \*      \*
>
> The Underwriter shall pay on behalf of the **Company** all **Loss** for which the **Company** becomes legally obligated to pay on account of any **Claim** first made against the **Company** during the **Policy Period** or the **Extended Reporting Period** or **Run-Off Coverage Period**, if exercised, for a **Wrongful Act** taking place before or during the **Policy Period**, subject to the applicable Limits of Liability set forth in Items 2 and 6 of the Declarations.

51.     The Policy defines **Loss**, in part, as "the total amount the **Insureds** become legally obligated to pay on account of **Claims** made against them for **Wrongful Acts** for which coverage applies, including but not limited to . . . **Defense Costs** . . . ."

52.     The Policy defines "**Defense Costs**" as:

> [T]hat part of **Loss** consisting of reasonable costs, charges, fees (including but not limited to attorney's fees and expert's fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the **Company**) incurred by the **Insureds** (i) in defending or investigating **Claims**, including costs assessed against the **Insureds** in a **Claim** or the premium for appeal, attachment or similar bonds, provided the Underwriter shall have no obligation to apply for or furnish such bonds, or (ii) at the Underwriter's request to assist the Underwriter in investigating a **Claim**.

53.     The Management and Company Liability Coverage Part defines a "**Claim**" as, among other things, "a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading."

54.     Zurich American Insurance Company ("Zurich") admitted in correspondence to RDP Barricade Company that the Frisch Lawsuit constituted a "**Claim**" under the Management and Company Liability Coverage Part.

55.     The **Policy Period** was October 29, 2015 to October 29, 2016.

56.     The Complaint in the Frisch Lawsuit was filed and served upon RDP Barricade Company during the **Policy Period**.

57.     The Policy's **Pending or Prior Date** was October 1, 2014.

58.     The Complaint filed in the Frisch Lawsuit was filed and served upon RDP Barricade Company after the Policy's **Pending or Prior Date**.

59.     The Policy defines the "**Company**" as the "**Policyholder** and its **Subsidiaries**...."

60.     RDP Barricade Company was the policyholder with respect to the Policy.

61.     As a result, RDP Barricade Company was an insured under The Management and Company Liability Coverage Part.

62.     The Management and Company Liability Coverage Part defines "**Insured Persons**" as "any one or more natural persons who were, now are or shall become a duly elected or appointed director, trustee, governor, **Manager**, officer, advisory director, or member of a duly constituted committee or board of the Company or their functional equivalent."

63.     The Policy defines a "**Manager**" as "any natural person who was, now is or shall become (i) a manager, member of the Board of Managers or equivalent executive of a partnership or joint venture that is expressly included as a **Company** by endorsement to this policy."

64.     At all relevant times, Ott was a director of RDP Barricade Company.

65.     As a result, Ott was an **Insured Person** under The Management and Company Liability Coverage Part.

66.     At all relevant times, Scharg was the duly-appointed manager of RDP Barricade Company.

67.     As a result, Scharg was an **Insured Person** under The Management and Company Liability Coverage Part.

68.     Under the Amended and Restated Operating Agreement, only Class A shareholders had voting rights in RDP Barricade Company.

69.     At all relevant times, DBC held the super-majority of the Class A equity shares in RDP Barricade Company.

70.     DBC is owned by Michael Opatowski ("Opatowski") and Stephen Elken ("Elken").

71.     DBC (and therefore Opatowski and Elken) had exclusive control over certain of the Manager's actions with respect to RDP Barricade Company, including those set forth in Section 4.6 of the Amended and Restated Operating Agreement.

72.     As a result, DBC (and therefore Opatowski and Elken) performed the services, or the functional equivalent, of a duly-elected or appointed director, trustee, governor, manager, officer, advisory director, or member of a duly-constituted committee or board of RDP Colorado Barricade.

73.     As a result, DBC (and therefore Opatowski and Elken) were **Insured Persons** under The Management and Company Liability coverage part.

74.     RDP Barricade Company promptly tendered the Complaint in the Frisch Lawsuit to Zurich on March 17, 2016—just 14 days after the lawsuit was filed—and requested that Zurich provide a defense.

75.     Less than 24 hours after receiving notice of the Frisch Lawsuit, Zurich denied that it had obligations to defend or afford coverage to RDP Barricade Company in the following email:

> Mr. Ott,
>
> I will be handling this matter on behalf of Zurich.  Based on a preliminary review, this matter appears to be precluded from coverage by, amongst [sic] other exclusions, the Insured v Insured exclusion.  As such, Zurich will not be appointing defense counsel.  However, I will provide the results of a comprehensive coverage analysis in a forthcoming coverage letter, which we anticipate providing within 30 days.  Should you wish to discuss anything regarding this matter, please do not hesitate to contact me.

76.     Insurance industry standards, as well as Colorado law, require that an insurer adequately explain any policy basis that it believes precludes coverage.

77.     In the email denying a defense and coverage to RDP Barricade Company, Zurich made no mention of Policy Exclusion IV.B, the Pending or Prior Litigation Exclusion.

78.     Insurance industry standards and Colorado law require that an insurer at the very least reserve its rights to deny coverage on grounds other than those stated to the insured.

79.     In the email denying a defense and coverage to RDP Barricade Company, Zurich did not reserve its rights to deny a defense on any grounds other than those stated in the email, including based on Policy Exclusion IV.B, the Pending or Prior Litigation Exclusion.

80.     Zurich's denial of a defense and coverage for the claims in the Frisch Lawsuit less than 24 hours after the Complaint was tendered was not the product of a thorough and reasoned investigation based upon all available information.

81.     On April 21, 2016, (more than 20 days after the March 18, 2016 email) RDP Barricade Company's insurance broker requested, but did not receive, the "comprehensive coverage analysis" referenced in Zurich's March 18, 2016 email.

82.     On November 10, 2016, RDP Barricade Company's insurance broker made a second request for the "comprehensive coverage analysis" referenced in Zurich's March 18, 2016 email.  Zurich, however, failed to provide it.

83.     Zurich stated that one reason for the delay in providing the "comprehensive coverage analysis" was that handling of the claim had been transferred to approximately four different claims personnel in the preceding eight months.

84.     On January 12, 2017, RDP Barricade Company's insurance broker made a third request for the "comprehensive coverage analysis" referenced in Zurich's March 18, 2016 email, but the insurer again failed to provide it.

85.     On March 27, 2017, more than one year after it said it would be providing the "comprehensive coverage analysis" within 30 days, Zurich sent a letter to RDP Barricade Company affirming its denial of a defense and coverage for the Frisch Lawsuit.

86.     In the letter, Zurich admitted that the Frisch Lawsuit constituted a "**Claim**."

87.     In the letter, Zurich admitted that the Complaint in the Frisch Lawsuit alleged "**Wrongful Acts**" as defined in the Policy.

88.     In the letter, Zurich admitted that RDP Barricade Company met the Policy definition of an insured "**Company**."

89.     In the letter, Zurich admitted that Ott and Scharg met the definition of "**Insured Persons**" under the Policy's Management and Company Liability Coverage Part.

90.     In the letter, Zurich admitted that Frisch was not an "**Insured Person**."

91.     As a result, the ground originally and exclusively relied upon by Zurich to deny a defense and coverage to RDP Barricade Company more than one year earlier (the "Insured v. Insured" exclusion) was not applicable.

92.     In the letter, Zurich asserted for the first time that Policy Exclusion IV.B, the Pending or Prior Litigation Exclusion, barred coverage.

93.      This Exclusion precludes coverage for **Loss**:

> [B]ased upon, arising out of, or attributable to any written demand, suit or proceeding pending, or order, decree or judgment entered against the Company or any Insured Person on or prior to the respective Pending or Prior Date set forth in the Coverage Schedule in Item 6 of the Declarations, or the same or substantially the same Wrongful Act, Interrelated Wrongful Acts, fact, circumstance or situation underlying or alleged therein.

94.     In the letter, Zurich asserted that the Policy's Pending or Prior Date was October 1, 2014, and that the Frisch Lawsuit was based upon and arose out of the letter sent by Sherman & Howard on behalf of Ott on August 14, 2014.

95.     The claims in the Frisch Lawsuit against RDP Barricade Company and certain of its equity shareholders in March 2016 were substantially and materially different from the request for reorganization made by Ott through Sherman & Howard in August 2014.

96.     Ott's request for reorganization was made by Ott against the company.

97.     Frisch's separate lawsuit, however, was brought by Frisch, and it sought different relief than that requested by Ott and asserted different claims against different parties.

98.     Also, in his lawsuit, Frisch alleged that his $50,000 management fee was wrongfully withheld from him, and that his company health insurance was wrongfully cancelled.

99.     In the August 14, 2014 letter sent by Sherman & Howard, Ott did not request that Frisch's $50,000 compensation be terminated or that his health insurance be cancelled.

100.    Both the discontinuation of Frisch's compensation and his company health insurance occurred within the **Policy Period** and long after the Policy's **Pending or Prior Coverage Date**.

101.    Further, the Complaint in the Frisch Lawsuit contained a number of allegations and claims evidencing that Frisch's relationship with certain of RDP Barricade Company's equity investors had deteriorated during the **Policy Period**, and after the Policy's **Pending or Prior Coverage Date**, due to other business dealings that had nothing to do with Ott's complaints in 2014.

102.   Additionally, and only to the extent relevant, there was no way for anyone to foresee at the time Sherman & Howard sent the letter on behalf of Ott that the company would, nearly a year later, resolve that dispute in a way that would be unsatisfactory to Frisch such that Frisch would demand a buy-out and, failing to reach an agreement on buy-out terms, would then file a lawsuit claiming that he had been wrongfully terminated from the company (and later, that his shares had been in effect "stolen" from him).

103.   Moreover, Zurich waived its right to rely on Exclusion IV.B, the Pending or Prior Litigation Exclusion, by not relying upon it as a basis to deny coverage on March 18, 2016, and by not reserving its right to disclaim coverage on that basis in the future.

104.   Furthermore, the Policy is ambiguous to the extent that it grants coverage for claims occurring before the Policy Period or Pending or Prior Coverage Date and then purports to exclude them through a separate exclusion.

105.   In addition to The Management and Company Liability Coverage Part, the Policy also contains a separate Employment Practices and Third Party Discrimination Liability Coverage Part, which states:

> The Underwriter shall pay on behalf of the **Insureds** all **Loss** for which the **Insureds** become legally obligated to pay on account of any **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or **Run-Off Coverage Period**, if exercised, for a **Wrongful Act** taking place before or during the **Policy Period**.

106.   The Employment Practices and Third Party Discrimination Liability Coverage Part defines an "Employment Practices Claim" as:

> A **Claim** which is brought and maintained by or on behalf of any past, present, future or prospective **Employees** of the **Company** against any **Insured** for any **Wrongful Act** in connection with any actual or alleged:  1.  Breach of any express or implied employment contract; … [or] 3.  employment-related torts including without limitation   wrongful   termination…[and]   wrongful   reference, deprivation of a career opportunity, demotion or adverse change in terms, conditions or status of employment . . . .

107.   With respect to this coverage part, Zurich's March 27, 2017 letter stated that "[b]ased on the information provided to date, it does not appear that Insuring Clause A is triggered because Frisch does not appear to be an employee . . . ."

108.   However, the insurer also stated in the same letter that "Frisch's precise role with RDP Barricade is unclear . . . ."

109.     Moreover, Frisch's lawsuit alleged that he agreed to perform certain services for RDP Barricade, that he received a $50,000 "management fee" in return, and that he and his family received company health insurance—which is an employee benefit—the latter two of which were allegedly wrongfully deprived from him in what he characterized as a "breach of contract."

110.     These allegations, as well as Zurich's acknowledgement that Frisch's precise role in the company was "unclear," gave rise to a defense under The Employment Practices and Third Party Discrimination Liability Coverage Part.

111.     All conditions precedent to the filing of this suit have either been satisfied by RDP Barricade Company, or excused by Zurich, or waived by its failure to reserve its rights.

## FIRST CLAIM FOR RELIEF
### (BREACH OF CONTRACT)

112.     RDP Barricade Company realleges each and every allegation of its Complaint and Jury Demand as if fully set forth herein.

113.     The Policy constitutes a contract of insurance.

114.     RDP Barricade Company has duly performed or satisfied each and every covenant and/or condition of the Policy to be performed or has been excused from so performing as a result of Zurich's material breach of its insurance agreement and/or its waiver of its rights.

115.     Under the terms of the Policy, Zurich had the obligation, *inter alia,* to investigate claims made against its insureds and to defend its insureds as to any claim potentially or even arguably falling with the Policy's coverage.

116.     In addition, Zurich had the obligation to investigate and indemnify any claims made against its insureds that fell within the Policy's coverage.

117.     In breach of the Policy, Zurich has failed and refused to defend and indemnify RDP Barricade Company with respect to the claims in the Frisch Lawsuit.

118.     As a direct and proximate result of Zurich's breach of its contractual duties, RDP Barricade Company is entitled to damages in an amount to be proved at trial, including but not limited to its fees and expenses incurred in defending the Frisch Lawsuit and indemnification for any liability it may incur in that action.

## SECOND CLAIM FOR RELIEF
### (Bad Faith Breach of Insurance Contract)

119.     RDP Barricade Company realleges each and every allegation of its Complaint and Jury Demand as if fully set forth herein.

120.    Zurich owed to RDP Barricade Company duties implied in law to deal with RDP Barricade Company fairly and in good faith, to promptly and reasonably investigate the claims made against RDP Barricade Company, and to make reasonable coverage decisions.  Zurich further covenanted that it would in good faith, and in the exercise of fair dealing, deal with RDP Barricade Company fairly and honestly, faithfully perform its duties of representation, and do nothing to impair, interfere with, hinder or potentially injure the rights of RDP Barricade Company to receive the benefits of the Policy.

121.    Zurich breached its obligations to act fairly and in good faith toward RDP Barricade Company by one or more of the following unreasonable acts:

(a)    Failing to conduct a reasonable and unbiased investigation based upon all available information into the claims asserted against RDP Barricade Company in the Frisch Lawsuit;

(b)    Failing and refusing to afford a defense and coverage to RDP Barricade Company in the Frisch Lawsuit without proper cause and without regard to the provisions of the Policy, relevant case law, and facts alleged or otherwise available to Zurich through reasonable investigation;

(c)    Misrepresenting pertinent insurance policy provisions relating to coverage for the claims asserted in the Frisch Lawsuit;

(d)    Ignoring and failing to timely respond to the insured's communications;

(e)    Failing to provide an adequate explanation of the Policy basis for Zurich's denial of a defense and coverage;

(f)    Denying a defense and indemnification to RDP Barricade Company less than 24 hours following tender of the Complaint in the Frisch Lawsuit, based on an incomplete and inadequate investigation, and on grounds Zurich later admitted did not apply;

(g)    Unreasonably delaying and failing to provide RDP Barricade Company with a comprehensive coverage analysis for more than one year, despite repeated requests that one be provided;

(h)    Not attempting in good faith to effectuate prompt, fair, and equitable resolution of the claims asserted against RDP Barricade Company in the Frisch Lawsuit;

(i)    Requiring RDP Barricade Company to institute litigation to recover amounts due under the Policy;

(j)    Engaging in other acts prohibited by C.R.S. § 10-1-101 and 10-3-1104(1)(h), which are incorporated by reference in their entirety; and

(k)      Other conduct to be revealed in discovery.

122.     As a direct and proximate result of Zurich's bad faith breach of insurance contract, RDP Barricade Company is entitled to damages in an amount to be proved at trial, including but not limited to any fees and expenses incurred in defending the Frisch Lawsuit, indemnification for any liability it may incur in that action, as well as any other damages resulting from Zurich's wrongful conduct.

### THIRD CLAIM FOR RELIEF
### (Violation of C.R.S. §10-3-1115 and -1116)

123.     RDP Barricade Company realleges each and every allegation of its Complaint and Jury Demand as if fully set forth herein.

124.     C.R.S. § 10-3-1115 forbids an insurer from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of a first-party claimant.

125.     RDP Barricade Company is a first-party claimant under § 10-3-1115.

126.     Zurich delayed and denied RDP Barricade Company's claim for Policy benefits without a reasonable basis within the meaning of § 10-3-1115.

127.     C.R.S. § 10-3-1116 provides, *inter alia,* that when a claim has been unreasonably denied by an insurer, the insured may bring an action to recover reasonable attorney fees and court costs, and two times the covered benefit.

128.     Zurich's actions as described above violate § 10-3-1115.

129.     RDP Barricade Company brings this claim to recover its reasonable attorney fees and court costs, and two times the covered benefit, pursuant to § 10-3-1116.

**WHEREFORE**, Plaintiff, RDP Barricade Company respectfully request that judgment be entered in its favor and against Defendant, Zurich American Insurance Company, as follows:

a.      For compensatory damages in amounts to be proved at trial;

b.      For all interest, statutory or moratory, allowed by law;

c.      For reasonable attorney fees and costs of suit herein;

d.      For two times the amount of covered benefits unreasonably delayed and/or denied pursuant to C.R.S. §10-3-1116;

e.      For such other and further relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Dated this 18th day of March 2018.

Respectfully submitted,

**LEVIN SITCOFF PC**

*/s/ Nelson A. Waneka*
Bradley A. Levin
Nelson A. Waneka

*Attorneys for Plaintiff*

Plaintiff's Address:
2295 S. Lipan Street
Denver, CO 80223

<table>
<tr><td>

**DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO**

1437 Bannock Street, Room 256
Denver, CO 80202
Telephone: (720) 865-8301

_____

**Plaintiff:**   **RDP BARRICADE COMPANY LLC**

**v.**

**Defendant:**   **ZURICH AMERICAN INSURANCE COMPANY**

_____

*Attorneys for Plaintiff:*
Bradley A. Levin, Reg. No. 13095
Nelson A. Waneka, Reg. No. 42931
**LEVIN SITCOFF PC**
1512 Larimer Street, Suite 650
Denver, CO  80202
Phone: (303) 575-9390
Fax: (303) 575-9385
bal@levinsitcoff.com
naw@levinsitcoff.com

</td><td>

DATE FILED: April 26, 2018 1:18 PM
FILING ID: C7C8B8E64682E
CASE NUMBER: 2018CV30965

▲ **COURT USE ONLY** ▲

_____

**Case Number: 2018CV30965**

**Division: 269**

</td></tr>
</table>

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT**: Zurich American Insurance Company

    **YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court an answer or other response to the attached Complaint. If service of the Summons and Complaint was made upon you within the State of Colorado, you are required to file your answer or other response within 21 days after such service upon you. If service of the Summons and Complaint was made upon you outside of the State of Colorado, you are required to file your answer or other response within 35 days after such service upon you. Your answer or counterclaim must be accompanied with the applicable filing fee.

    If you fail to file your answer or other response to the Complaint in writing within the applicable time period, the Court may enter judgment by default against you for the relief demanded in the Complaint without further notice.

The following documents are also served with this summons: Complaint and Jury Demand, Civil Case Cover Sheet, and Delay Reduction Order.

Dated this 20th day of April 2018.

Respectfully submitted,

**LEVIN SITCOFF PC**


_/s/ Nelson A. Waneka_
Bradley A. Levin
Nelson A. Waneka

*Attorneys for Plaintiff*